[Crim. No. 9911. Second Dist., Div. Three. May 17, 1965.]

THE PEOPLE, Plaintiff and Respondent, v. THOMAS WESLEY KING et al., Defendants and Appellants.

424

Ramsey, Emlein & Cullum and J. Raymond Cullum for Defendants and Appellants.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and George J. Roth, Deputy Attorney General, for Plaintiff and Respondent.

FORD, J.—In a nonjury trial the defendants King and Davis were found guilty of possession of marijuana in violation of section 11530 of the Health and Safety Code. They were sentenced to be punished by imprisonment in the state prison for the term prescribed by law. Each defendant has appealed from the judgment pronounced against him.

Two questions must be resolved. The first is whether the police officers obtained the marijuana by means of an illegal search and seizure. The second question relates to the impact of the reasoning of *People* v. *Dorado*, 62 Cal.2d 338 [42 Cal. Rptr. 169, 398 P.2d 361], upon the evidence received as to statements made by the defendants after their arrest. At the trial, pursuant to stipulation, the case was submitted upon the testimony given at the preliminary examination, the only witnesses being Police Officers Rickard and Hitchings of the City of Long Beach.

At approximately 10 p.m. on October 2, 1963, Sergeant

Hitchings and Officer Miller went to the vicinity of the defendant King's residence. The front of the house was "Probably 50 to 65 feet" from the sidewalk. (At the trial it was stipulated that the residence was surrounded by a picket fence about four and a half feet high. There were two gates.)[1] The officers had no search warrant and no warrant for the arrest of either defendant.

Sergeant Hitchings testified: "We had recent numerous complaints from residents in the area that Mr. King was keeping late hours and had an odd assortment of company. We had made several periodic checks during the week on the King residence and on going to the location on the night of arrest I observed people who were known and convicted narcotic offenders."

The officers parked the police car and walked toward two persons standing near vehicles in the parking lot adjacent to the premises of the defendant King. The horn of one vehicle was sounded and Mr. Rogers, "a known and convicted narcotic offender," emerged from Mr. King's house. After looking in the direction of the officers, Mr. Rogers ran through the adjacent alley. Sergeant Hitchings and Officer Miller pursued and stopped him. There was "a definite odor of marijuana smoke about the person of Mr. Rogers," but no narcotics were found to be in his possession.

After the search of Mr. Rogers, Sergeant Hitchings went upon the front porch of the defendant King's house and, at approximately 12:24 a.m., looked through a window adjacent to the front door. The blind was drawn but there was an opening of approximately $1\frac{1}{2}$ to 2 inches in width through which the officer peered into the living room. Part of his testimony was: "Q. Did you stand erect on the porch and look in the room or was it necessary to stoop? A. I had to stoop somewhat. Q. At what distance from the floor would you estimate your eyes were as you looked through at Mr. Davis? A. Probably would have been about a foot or whatever the bottom level of the window sill is. It probably was three—to four feet above the floor level." The officer also testified as follows: "Q. Officer Hitchings, would it be possible for you to have

---

[1] At the trial the defendants' attorney stated: "As indicated by the stipulation which we have entered into, the distance from the front gate, at least, to the porch of the house was perhaps some fifteen or twenty feet at the outside." The diagram in evidence shows that the entry gates to the front and rear doors of the house were in the picket fence bordering the alley which ran along the east side of the defendant King's property.

seen Mr. Davis and observed the activity you have described from any position other than what you have described? In other words, could you have seen what you have described from any position other than you have described? A. I doubt it very much.''

Upon looking into the interior of the house, Sergeant Hitchings observed the defendant Davis sitting on the sofa in the living room, a white cardboard box being on his lap, and rolling green leafy material into cigarette form. In the opinion of the officer, based on his prior experience, the green leafy material was marijuana. Sergeant Hitchings told Officer Miller of his observation. Officer Miller looked through the window. Sergeant Hitchings then entered the house through the rear door after forcing open the screen door.[2] Officer Miller ''broke in'' the front door. The defendant Davis jumped up from the sofa and ran toward the ''bathroom area'' with the cardboard box in his hands. As Sergeant Hitchings entered the living room the defendant King ''ran for the area of the bathroom.''

The contents of the box fell onto the bathroom floor. Sergeant Hitchings asked the defendant Davis what the material was, but he received no response. In reply to a similar inquiry the defendant King said, ''I've got a pretty good idea.'' Both men were handcuffed and taken back to the living room.

While still at his residence the defendant King was asked to explain the presence of the marijuana. He said that he was not certain who had brought the marijuana to his house but that he had allowed the defendant Davis to come there and roll it into cigarette form. He further said that he, Davis and Rogers had smoked marijuana in Rogers' apartment a week prior to the date of the arrest. Later at the police station, the defendant King stated that he knew that Rogers and Rogers' partner were currently dealing in large quantities of marijuana.

Officer Rickard testified that at the police station shortly after the arrest the defendant Davis made statements freely and voluntarily. He said that he had smoked marijuana from time to time over the previous eight years and was of the opinion that such conduct involved no wrong. His last use occurred approximately two weeks before the night of the

[2]Sergeant Hitchings testified in part as follows: ''Q. So your decision to enter the house was solely on the box held by Mr. Davis? A. That is correct.''

arrest. He told the officer that he had been previously convicted of possession of marijuana. He stated, however, that he would not say anything about the marijuana found at the time of his recent arrest until he had talked with his attorney.

It was stipulated that it would be deemed that an expert forensic chemist had been called as a witness and had testified that he had examined the seized material and had formed the opinion that the examined material was marijuana.

The seized marijuana was received in evidence at the trial over the objection of the defendants based on the ground that there had been an illegal search and seizure.

The circumstances of which the officers were aware, including the presence of "known and convicted narcotic offenders," one of them being Mr. Rogers who was seen emerging from the house, warranted the inference that it was probable that there was a supply of narcotics in the defendant King's residence. (See *People* v. *Torres*, 56 Cal.2d 864, 867 [17 Cal.Rptr. 495, 366 P.2d 823].) Further investigation by the officers was justified. (Cf. *People* v. *Holloway*, 230 Cal.App.2d 834 [41 Cal.Rptr. 325]; *People* v. *Steffano*, 177 Cal.App.2d 414 [2 Cal.Rptr. 176].)

The crucial question to be resolved on this appeal is whether the observation made by the officers through the window of the defendant King's residence constituted an unlawful search. The nature of a search was defined in *Bielicki* v. *Superior Court*, 57 Cal.2d 602, wherein the court stated at page 605 [21 Cal.Rptr. 552, 371 P.2d 288]: " '[T]he term implies some exploratory investigation or an invasion and quest, a looking for or seeking out. . . . A search implies a prying into hidden places for that which is concealed and that the object searched for has been hidden or intentionally put out of the way.' (*People* v. *West* (1956) 144 Cal.App.2d 214, 219 [5] [300 P.2d 729].) The constitutional guarantees, of course, prohibit not all searches but only those that are 'unreasonable.' (*United States* v. *Rabinowitz* (1950) 339 U.S. 56, 60 [70 S.Ct. 430, 94 L.Ed. 653]; *People* v. *Maddox* (1956) 46 Cal.2d 301, 306 [6] [294 P.2d 6].)"

There are recent federal cases suggesting or holding that under the circumstances therein presented, observations made through a window of a residence constitute an illegal search.[3]

---

[3]In *Monnette* v. *United States*, 299 F.2d 847, the court said at pages 850-851: "If the house was in fact the dwelling of Monnette, this peering [through the rear windows] into the dwelling was a trespass certainly and probably violated his right to privacy as well. Neither of these questions need concern us here, however, for the agents discovered nothing

But, as stated in *Ker* v. *California*, 374 U.S. 23, at page 31 [83 S.Ct. 1623, 10 L.Ed.2d 726] : "*Mapp* [*Mapp* v. *Ohio*, 367 U.S. 643 (81 S.Ct. 1684, 6 L.Ed.2d 1081, 84 A.L.R.2d 933)], however, established no assumption by this Court of supervisory authority over state courts, cf. *Cleary* v. *Bolger* (1963) 371 U.S. 392, 401 [83 S.Ct. 385, 9 L.Ed.2d 390], and, consequently, it implied no total obliteration of state laws relating to arrests and searches in favor of federal law." And, at page 33 of the opinion in *Ker*, referring to Justice Butler's reasoning in *Go-Bart Importing Co.* v. *United States*, 282 U.S. 344, 357 [51 S.Ct. 153, 75 L.Ed. 374], it was said : "He also recognized that '[t]here is no formula for the determination of reasonableness. Each case is to be decided on its own facts and circumstances.' " (See *Bielicki* v. *Superior Court, supra,* 57 Cal.2d 602, 605.)

In *Bielicki* the Supreme Court of California made reference to "the settled rule that 'looking through a window does not constitute an unreasonable search' (*People* v. *Martin* (1955) 45 Cal.2d 755, 762 [13] [290 P.2d 855]," but did not undertake in that case "to define the origin, location, or minimum diameter of the apertures through which police officers may look without making a search in violation of constitutional rights." (57 Cal.2d, at p. 607.) With respect to the aspect of trespass, Professor Collings has said : "It seems to be assumed without discussion in several cases that minor trespass, not involving entry into a building, may be justified as reasonable investigation. This seems proper since the constitutional protection extends only to 'persons, houses, papers, and effects,' and even then forbids only 'unreasonable searches and seizures.' In *People* v. *Martin* [45 Cal.2d 755 (290 P.2d 855)], officers looked through the rear window of an office building and saw activities which became the basis of a bookmaking arrest. Whether they trespassed to get to the window is not stated. The court, without discussion, broadly stated that looking through a window is not an unreasonable search." (Collings, *Toward Workable Rules of Search and Seizure— An Amicus Curiae Brief* (1962) 50 Cal.L.Rev. 421, 432.)

from their look into the house." In *California* v. *Hurst*, 325 F.2d 891, at page 898, the court stated : "We feel that officer Grennan's bathroom [window] observations constituted an unlawful invasion of privacy to the same extent as occurred in *Brock* v. *United States* (5th Cir. 1955) 223 F.2d 681, at page 685, where it was said : 'Whatever quibbles there may be as to where the curtilage begins and ends, clear it is that standing on a man's premises and looking in his bedroom window is a violation of his "right to be let alone" as guaranteed by the Fourth Amendment.' "

In *People* v. *Steffano, supra,* 177 Cal.App.2d 414, unidentified men were seen to enter one unit of a triplex, remain a short time, and then leave. After having made observations of the premises on approximately six occasions over a period of about two weeks, police officers went to the rear of the unit. All of the blinds were drawn, but the blind did not completely cover one window and it was thus possible to see into the house. An officer observed the defendant through this window. Over the glass panels of a rear door was a drawn shade which was quite worn and frayed in places so that it did not afford complete coverage. Through one of these glass panels another officer observed the defendant. In this manner the officers saw the defendant's bookmaking activities. In rejecting the claim of illegality, the court stated (177 Cal.App.2d, at p. 417) : "Making observations through a window does not constitute an illegal search, and the officers were entitled to act upon the information thus obtained."

One of the cases upon which reliance was placed in *Steffano* was *People* v. *Moore,* 140 Cal.App.2d 870 [295 P.2d 969], wherein officers observed bookmaking activities by looking through a dining-room window of a residence. While the window had venetian blinds, there were apertures through which the officer was able to see the defendant. The court held that there had been no unreasonable search. (140 Cal.App.2d, at p. 871.) In a later case, *People* v. *Covan,* 178 Cal.App.2d 416 [2 Cal.Rptr. 811], it was held that no illegal search was involved where an officer, acting upon information which he had received, looked through a side window into the dining room of the defendant's home and observed heroin being prepared for distribution or use.

*People* v. *Aguilar,* 232 Cal.App.2d 173 [42 Cal.Rptr. 666], was a case wherein officers looked through a motel window which faced on the street. Between the public sidewalk and the window was a row of bushes located directly in front of the window and approximately 6 to 8 inches from it. The row was not a formal hedge; there were spaces between the several bushes. An officer stepped between these bushes, crouched down, and looked through the window into the apartment. From his observations the officer concluded that the defendant was preparing to give himself an injection of narcotics. In rejecting the contention that there was an illegal search, the court stated (232 Cal.App.2d, at p. 177) : "In the instant case, the record does not show that the window was not open to public view. If a defendant conducts his activities under

circumstances indicating an indifference to public observation, he cannot object if the observer is a policeman.''

In *State* v. *Smith*, 37 N.J. 481 [181 A.2d 761], cert. denied 374 U.S. 835 [83 S.Ct. 1879, 10 L.Ed.2d 1055], the defendant and two other men were arrested in a flat occupied by the defendant's mother on the third floor of a three-family house. At the time of the arrest a quantity of heroin and a hypodermic needle were seized. The officers had neither a search warrant nor an arrest warrant. The officers had gone through the common hallway to the third floor. Upon looking through a crack at the molding of the door (although one officer could not recall whether he looked through that opening or through the keyhole), they saw one of the men in the living room with a tourniquet around his arm and a hypodermic needle in his hand. The officers immediately broke in and arrested the three men. Heroin was seized. After determining that the presence of the officers at the door to the apartment itself involved no misconduct or violation of the rights of anyone, the court stated (37 N.J. at p. 496, 181 A.2d at p. 769) : ''This leaves the fact that officers looked through an opening to view what was going on within the apartment. Peering through a window or a crack in a door or a keyhole is not, in the abstract, genteel behavior, but the Fourth Amendment does not protect against all conduct unworthy of a good neighbor. Even surveillance of a house to see who enters and leaves is something less than good manners would permit. But it is the duty of a policeman to investigate, and we cannot say that in striking a balance between the rights of the individual and the needs of law enforcement, the Fourth Amendment itself draws the blinds the occupant could have drawn but did not. In the absence of a physical entry into premises secured by the Amendment, there is no unreasonable search. In such circumstances it has been held that the guaranteed right of privacy is not violated when a police officer, by use of his senses, detects a criminal event occurring in an area protected by the Amendment. As to eavesdropping, see *Goldman* v. *United States* (1942) 316 U.S. 129 [62 S.Ct. 993, 86 L.Ed. 1322] (even with aid of detectaphone; cf. *Silverman* v. *United States* (1961) 365 U.S. 505, 509-510 [81 S.Ct. 679, 5 L.Ed.2d 734, 738]); *United States* v. *Buchner* (D.D.C. 1958) 164 F. Supp. 836, affirmed mem. (D.C.Cir. 1958) 106 U.S. App. D.C. 16, 268 F.2d 891, cert. denied (1959) 359 U.S. 908 [79 S.Ct. 584, 3 L.Ed.2d 573]; *People* v. *Rucker* (D.Ct.App. 1961) 197 Cal.App.2d 18 [17 Cal.Rptr. 98]. As to looking through windows, cracks

in walls or doors, etc., see *Agnello* v. *United States* (1925) 269 U.S. 20 [46 S.Ct. 4, 70 L.Ed. 145] ; Jackson, J., concurring in *McDonald* v. *United States, supra* (335 U.S., at p. 458, 69 S.Ct. at p. 194, 93 L.Ed. at 160) ; *Burks* v. *United States* (9th Cir. 1961) 287 F.2d 117 ; *Martin* v. *United States* (5th Cir. 1946) 155 F.2d 503 ; *United States* v. *Purgitt* (D.D.C. 1959) 176 F. Supp. 557 ; *People* v. *Martin* (Sup. Ct. 1955) 45 Cal.2d 755 [290 P.2d 855] ; *People* v. *Ruiz* (Dist.Ct.App. 1956) 146 Cal.App.2d 630 [304 P.2d 175] ; *Griffin* v. *State, supra* (200 Md. 569 [92 A.2d 743]) ; *Wilkes* v. *State* (Ct. Crim. App. 1926) 105 Tex. Cr. R. 430 [289 S.W. 44]. As to looking through a window from a fire escape, compare *Cheng Wai* v. *United States* (2d Cir. 1942) 125 F.2d 915 (apartment house), with *Whitley* v. *United States* (D.C. Cir. 1956) 99 U.S.App. D.C. 159, 237 F.2d 787 (rooming house).''

In the case presently before this court, the trial judge was justified in drawing the inference that the picket fence did not prevent a view from the public sidewalk or adjacent premises of the front yard of the defendant King's residence, or prevent entry into that yard, and that the front yard and the front porch were open for the purpose of use as a means of access by all persons having legitimate business with the occupants. The fact that there was an uncovered portion of the window adjacent to the front door through which the officers could see into the living room was not brought about by any act on the part of the officers or third persons. (Cf. *People* v. *Regalado*, 224 Cal.App.2d 586, 589 [36 Cal.Rptr. 795].) The presence or absence of such an aperture was a matter within the control of the occupants of the house. The open space was at such a point that any person who came upon the porch could have ready access to it. ■ The circumstance that Sergeant Hitchings had to lower the position of his head to see through the opening is not a decisive factor in resolving the question presented in this case since the propriety of the officer's action could not reasonably be held to depend upon the chance factor of the location of the uncovered portion of the window. (Cf. *People* v. *Steffano, supra,* 177 Cal.App.2d 414.) ■ The conduct of the officers did not constitute a general exploratory search (see *People* v. *Regalado, supra,* 224 Cal.App.2d 586, 589) but was a reasonable pursuit of their duty in view of the activity on and adjacent to the premises which, as related hereinabove, they had observed.

In *Ker* v. *California, supra,* 374 U.S. 23, it was said at pages

33-34: "We reiterate that the reasonableness of a search is in the first instance a substantive determination to be made by the trial court from the facts and circumstances of the case and in the light of the 'fundamental criteria' laid down by the Fourth Amendment and in opinions of this Court applying that Amendment. Findings of reasonableness, of course, are respected only insofar as consistent with federal constitutional guarantees." In the present case the trial court's finding of reasonableness was warranted. ■ In the light of the circumstances which caused the officers to go upon the front porch of the house and in view of the nature of the place on the premises from which the officers were able to see into the house, their action was not an unreasonable invasion of the privacy of the defendants. (See *United States* v. *Polk*, 201 F. Supp. 555, affd. 314 F.2d 837; see also *California* v. *Hurst*, 325 F.2d 891, 899.)

■ Since the observations of the officers disclosed probable cause for the arrest of the person whose activities were seen, the officers were justified in entering the house. It was not unlawful for them to force entry without first demanding admittance and explaining the purpose for which admittance was desired (see Pen. Code, § 844) since the officers were not required to afford any person in the house the opportunity of disposing of contraband before the officers could seize it. (*People* v. *Covan, supra,* 178 Cal.App.2d 416, 418-419.)

■ As stated in *People* v. *Maddox,* 46 Cal.2d 301, at page 306 [394 P.2d 6] : "It must be borne in mind that the primary purpose of the constitutional guarantees is to prevent unreasonable invasions of the security of the people in their persons, houses, papers, and effects, and when an officer has reasonable cause to enter a dwelling to make an arrest and as an incident to that arrest is authorized to make a reasonable search, his entry and his search are not unreasonable.

■ Suspects have no constitutional right to destroy or dispose of evidence, and no basic constitutional guarantees are violated because an officer succeeds in getting to a place where he is entitled to be more quickly than he would, had he complied with section 844. ■ Moreover, since the demand and explanation requirements of section 844 are a codification of the common law, they may reasonably be interpreted as limited by the common law rules that compliance is not required if the officer's peril would have been increased or the arrest frustrated had he demanded entrance and stated his purpose. (*Read* v. *Case,* 4 Conn. 166, 170 [10 Am. Dec. 110] ; see Rest.,

Torts, § 206, com. d.)'' (See *Ker* v. *California, supra,* 374 U.S. 23, 37-41.)

There remains for consideration the matter of the application of the reasoning of *People* v. *Dorado, supra,* 62 Cal.2d 338, to this case. The record fails to disclose that, prior to the questioning by police officers, either defendant had been effectively informed of his right to counsel or of his absolute right to remain silent, and there is no evidence that either defendant had waived those rights.

The defendant King stated to Sergeant Hitchings that he had ''a pretty good idea'' of the nature of the seized material. He further said that he was not certain who had brought the marijuana to his house but that he had allowed the defendant Davis to come there and roll it into cigarette form. He also admitted that he had previously smoked marijuana and that he knew of the narcotic activities of the earlier visitor, Mr. Rogers. The defendant King thus disclosed his knowledge of the presence and narcotic character of the marijuana. But another element of the offense of possession is that the accused exercised dominion and control over the narcotic.[4] (*People* v. *Redrick,* 55 Cal.2d 282, 285 [10 Cal.Rptr. 823, 359 P.2d 255].) While the defendant King's statements had some evidentiary value on that issue, they did not constitute an admission that the contraband had been under his dominion and control. (See *People* v. *Lama,* 129 Cal.App.2d 391, 393 [276 P.2d 816].) Consequently, his statements were not in the nature of a confession. In view of the testimony of Sergeant Hitchings as to the presence and activity of the defendant King at the time the officers entered his residence, it would not be reasonable to categorize the admission of the evidence of such statements as being other than harmless error. The defendant King suffered no miscarriage of justice.

While at the house the defendant Davis made no admission. At the police station he declined to say anything about the marijuana found at the time of his arrest but he did admit that he had used marijuana on prior occasions and had previously been convicted of the crime of possession of that narcotic. No confession was involved and under the circumstances of this case the receipt in evidence of such state-

---

[4]In *People* v. *Hancock,* 156 Cal.App.2d 305, the court said at page 310 [319 P.2d 731]: ''The crime of possession of narcotics requires a physical or constructive possession with actual knowledge of the presence of the narcotic substance. (*People* v. *Gory,* 28 Cal.2d 450 [170 P.2d 433].) 'Possession' means ' '' one under the dominion and control of defendant.'' ' ''

ments made at the police station constituted, at most, harmless error. There was no miscarriage of justice.

The judgment as to the defendant King is affirmed. The judgment as to the defendant Davis is affirmed.

Shinn, P. J., and McMurray, J. pro. tem.,* concurred.

Appellants' petition for a hearing by the Supreme Court was denied July 14, 1965.

---

*Assigned by the Chairman of the Judicial Council.