19 Cal.App.3d 14 (1971)
96 Cal. Rptr. 397
THE PEOPLE, Plaintiff and Appellant,
v.
KENNETH WAYNE COLVIN et al., Defendants and Respondents.
Docket No. 18383.
Court of Appeals of California, Second District, Division Four.
July 30, 1971.
*17 COUNSEL
Thomas C. Lynch and Evelle J. Younger, Attorneys General, William E. James, Assistant Attorney General, Joseph P. Busch, Jr., District Attorney, Harry Wood and Daniel L. Lieberman, Deputy District Attorneys, for Plaintiff and Appellant.
Edward J. Horowitz, under appointment by the Court of Appeal, Richard S. Buckley, Public Defender, James L. McCormick, Clive Martin and Harry W. Brainard, Deputy Public Defenders, for Defendants and Respondents.
OPINION
DUNN, J.
By information, five defendants were charged in count I with possession of heroin, a felony (Health & Saf. Code, § 11500), three of them being additionally charged in count II with maintaining a place for the purpose of unlawfully selling or using a narcotic, heroin (Health & Saf. Code, § 11557). Each defendant pled "not guilty" and moved to set aside the information (Pen. Code, § 995). The motions were granted. The People appeal from the order setting aside the information (Pen. Code, § 1238, subd. (a)(1)).
To pass upon the motion, the trial court reviewed the evidence received at the preliminary hearing. At that hearing, Police Officer Ron Allinson *18 testified as follows: At 8:30 p.m. on September 15, 1969 he proceeded to an apartment building at 9208 Stewart & Gray Road, Downey, in response to a radio call to assist Officer Westray in the investigation of a burglary. When Allinson arrived, he advised Westray that he would cover the building from the rear. Accordingly, he began walking down a public driveway located between 9208 and 9202 Stewart & Gray Road, the latter address being that of another apartment building.[1] At a point approximately 10 feet from an open bathroom window of an apartment located in number 9202, he heard a man state in a loud voice: "No, man. I have got the money for the seven lids; let's go get them." As an expert in narcotics investigation, Allinson knew the term "lid" meant a $10 bag of marijuana.
The light was on in the bathroom, and he could see the entire interior through a "ripple type" glass shower door. The door was 6 feet high and extended across the room from wall to wall. Although the door was completely closed, "you could see through it, make out  not real plainly  what was on the other side, but you could see." Allinson saw a man and a woman, but was unable to identify them. He stepped closer to the window, which was 5 1/2 to 6 feet above the driveway. Allinson heard several male voices, and the man in the bathroom was yelling so people in the front room could hear him. He then heard a "conversation regarding balloons of stuff" and also heard a man say that he was taking "six reds at a time." From experience he knew "stuff" meant heroin, which is commonly packaged in balloons, and "reds" referred to sodium secobarbital.
Following these conversations, several men left the apartment and drove away. Based on this occurrence, plus what he had heard, Allinson concluded they had gone to buy narcotics or dangerous drugs.
When the men returned 10 minutes later, Allinson still was looking into the bathroom window. However, now he was standing on a guardrail placed over gas meters to protect them from vehicles entering the driveway. In this position he was 5 inches from the window. The shower door remained closed, but he could see through it into the living room. He saw the female defendant leave the bathroom to go towards the front room and saw defendants Emerick, Colvin and Dye; the latter two were known to him as past narcotic offenders.
Dye and defendant Moxley soon entered the bathroom, placed their hands near the top of the toilet, and unwrapped something. Looking through the shower door Allinson could distinguish only forms, and so could not see clearly what the men were doing. He heard one of them say, "This looks like a good dime paper [$10 worth of heroin]." The other said, "Don't spill it." Allinson then heard paper being torn and folded *19 and the further comment: "This looks like a pretty good nickel paper." He understood this to mean $5 worth of heroin, which commonly is wrapped in a piece of paper. He formed the opinion that the men were dividing a $10 quantity of heroin into two $5 portions.
Allinson left his position by the window, obtained a key from the manager, unlocked the door of the apartment, and entered without announcing himself. He saw narcotics paraphernalia and heroin on the kitchen table. In the bathroom he saw a magazine on the top of the toilet. Two corners of the back page had been torn off. The heroin and the magazine were taken as evidence.
All of the defendants were found in the apartment. They were arrested for violation of "narcotic laws," and were searched. Heroin was found on Colvin and on defendant Samaduroff. The heroin on Colvin's person was wrapped in a piece of paper which had been torn from the magazine. On inquiry made after appropriate cautionary advice was given, defendants Emerick, Moxley and Colvin stated they lived in the apartment.
(1a) Defendants contend the information was properly set aside because the evidence, which was the basis of the charge against them, was illegally obtained and hence incompetent. Priestly v. Superior Court (1958) 50 Cal.2d 812, 815 [330 P.2d 39]; Badillo v. Superior Court (1956) 46 Cal.2d 269, 271 [294 P.2d 23]; People v. Johnson (1957) 155 Cal. App.2d 369, 372 [317 P.2d 1000]. (2a) They argue, first, that Officer Allinson's act of looking through the window from the guardrail was not a reasonable search because it constituted an unreasonable invasion of their privacy, rendering inadmissible the evidence obtained as the ultimate result of his observations. The People dispute this, additionally contending the evidence was admissible because it was obtained as an incident to arrests made on probable cause furnished by Allinson's observations before he stood on the guardrail.
(3a) Essential to the determination of reasonableness in cases where officers obtain probable cause for arrest through their own observations, is a consideration of the degree of privacy which a defendant reasonably may expect in the place occupied by him. People v. Berutko (1969) 71 Cal.2d 84, 93 [77 Cal. Rptr. 217, 453 P.2d 721]. (4a) Defendants argue that because the activities observed took place in a bathroom, they reasonably could expect absolute privacy. However, for purposes of the Fourth Amendment, "[i]t makes no difference ... that an observation is made through a bathroom window rather than a frontroom window ..., a dining room window ... or a window in the rear of the house." People v. Willard (1965) 238 Cal. App.2d 292, 298 [47 Cal. Rptr. 734].
(3b) There is no precise formula for the determination of reasonableness; *20 each case must be decided on its own facts and circumstances. People v. Berutko, supra, 71 Cal.2d at page 93; Cohen v. Superior Court (1970) 5 Cal. App.3d 429, 434 [85 Cal. Rptr. 354]; People v. Ramsey (1969) 272 Cal. App.2d 302, 308 [77 Cal. Rptr. 249]; People v. Willard, supra, 238 Cal. App.2d at page 307.
(2b) The officer's attention was first attracted by the loud sound of voices coming through the bathroom window. The window faced a public driveway; the window was open; persons in the driveway could see into the room beyond the closed shower door. Under these circumstances, defendants could not reasonably expect freedom from observation.
Defendants contend that because Allinson stood on the guardrail, his observations from that height constituted an unreasonable intrusion on whatever privacy they otherwise could have expected. (4b) However, the height from which an officer makes his observation is not ipso facto determinative of the question whether his actions violated defendant's privacy. Thus, in People v. King (1965) 234 Cal. App.2d 423 [44 Cal. Rptr. 500], a police officer went to defendant's front porch and had to stoop down to peer into a window through an opening at the bottom of it. The court concluded such observation did not constitute an unlawful search, as being an unreasonable invasion of privacy, stating (p. 432): "The circumstance that Sergeant Hitchings had to lower the position of his head to see through the opening is not a decisive factor ... since the propriety of the officer's action could not reasonably be held to depend upon the chance factor of the location of the uncovered portion of the window." (And see People v. Berutko, supra, at pp. 92-93.) Similarly, in People v. Aguilar (1965) 232 Cal. App.2d 173 [42 Cal. Rptr. 666] it was held that a police officer's conduct in looking through an apartment window which faced on the street did not constitute an illegal search even though he had gained his vantage point by stepping between some bushes and crouching down.
(2c) Citing Cohen v. Superior Court, supra, 5 Cal. App.3d 429, defendants further argue that because the purpose of the guardrail was to protect the meters, not to stand on, they reasonably could assume they were free from observation by a person standing on the rail. In Cohen, police officers looked through defendants' window from a fire escape landing on the fourth floor of an apartment building. This court held it was a question of fact whether defendants reasonably could assume they were free from inspection by a person on the fire escape landing, and that resolution of the question depended, inter alia, on customary use, if any, of the landing in nonemergency situations. (5) "When ... a person by his own action or neglect allows visual access to his residence by providing an aperture adjacent to a common area, he may not complain that police *21 officers who were lawfully present in that area have utilized that aperture to detect the commission of crime within." People v. Berutko, supra, 71 Cal.2d at pages 93-94. (And see People v. Willard, supra, 238 Cal. App.2d 292; People v. Earl (1963) 216 Cal. App.2d 607 [31 Cal. Rptr. 76].)
(6a) The resolution of a factual matter by the committing magistrate may not be set aside by the superior court acting as a reviewing tribunal pursuant to Penal Code section 995. Thus, if there is some evidence supporting the information, the sufficiency thereof is not an issue. (Perry v. Superior Court (1962) 57 Cal.2d 276, 283-284 [19 Cal. Rptr. 1, 368 P.2d 529]; People v. Heard (1968) 266 Cal. App.2d 747, 749-750 [72 Cal. Rptr. 374].) (2d) The record before us does not indicate the height of the guardrail or of the officer; however, the magistrate would have observed how tall the officer was, since the officer appeared and testified. The record does show that the officer's observations were made through an open ground floor window, located 5 1/2 to 6 feet above a public driveway. Under the circumstances the magistrate could conclude there was no reasonable expectation of privacy respecting what the officer was able to see and hear from the outside.
(1b) What Allinson saw and heard furnished probable cause to believe a public offense was being committed in his presence. Therefore, he was justified in entering the apartment (People v. King, supra, 234 Cal. App.2d at p. 433) and arresting all of the defendants (Pen. Code, § 836, subd. 1; People v. Sandoval (1966) 65 Cal.2d 303, 308 [54 Cal. Rptr. 123, 419 P.2d 187]). The searches of defendants were proper since they were incident to the arrests. People v. Dickenson (1962) 210 Cal. App.2d 127, 135 [26 Cal. Rptr. 601]; People v. Adame (1959) 169 Cal. App.2d 587, 598 [337 P.2d 477]. No search was involved in the discovery of the heroin in the kitchen and the magazine in the bathroom, since these items were in plain sight. Bielicki v. Superior Court (1962) 57 Cal.2d 602, 605 [21 Cal. Rptr. 552, 371 P.2d 288]; People v. Baranko (1962) 201 Cal. App.2d 189, 195 [20 Cal. Rptr. 139]. It follows that the evidence was not incompetent on the ground it was the product of a search which unlawfully resulted from Allinson's observations.
(7a) Defendants contend the information nevertheless was properly set aside because Officer Allinson admittedly did not comply with Penal Code section 844[2] in entering the apartment, and such noncompliance was not excused.[3]
*22 (8) Noncompliance with section 844 may be excused when an officer acts on a reasonable and good faith belief that compliance would permit the destruction of evidence. People v. Bradley (1969) 1 Cal.3d 80, 88 [81 Cal. Rptr. 457, 460 P.2d 129]; People v. Rosales (1968) 68 Cal.2d 299, 305 [66 Cal. Rptr. 1, 437 P.2d 489]. Such a belief, however, cannot be justified by an officer's general experience relative to the disposability of the kind of evidence sought and the general propensity of offenders to effect disposal. People v. DeSantiago (1969) 71 Cal.2d 18, 28 [76 Cal. Rptr. 809, 453 P.2d 353]; People v. Gastelo (1967) 67 Cal.2d 586, 589 [63 Cal. Rptr. 10, 432 P.2d 706]. "[C]ompliance with the applicable knock-and-notice provision is excused not because of a blanket rule based on the type of crime involved but because the particular circumstances of the case give rise to a reasonable belief that immediate action is necessary to prevent the destruction of physical evidence." People v. De Santiago, supra, 71 Cal.2d at page 29.
(7b) Allinson's belief that the evidence would be destroyed stemmed from the following circumstances: (1) on 20 occasions when he had entered residences to make arrests for possession of heroin, the occupants had flushed the contraband down the toilet; (2) here, there were known narcotics offenders in the apartment; (3) Dye and Moxley were "cutting" the heroin immediately over an open toilet and if anyone entered the residence he believed they were going to flush it down; and (4) to Allinson's knowledge Dye, on an earlier occasion, had attempted to dispose of evidence by throwing marijuana out of a car when he was stopped by the police.
(9) Whether a police officer reasonably held the requisite beliefs, justifying noncompliance with section 844, is a question to be determined by the trier of fact. People v. Thornton (1970) 8 Cal. App.3d 741, 745 [87 Cal. Rptr. 535]; People v. Perales (1970) 4 Cal. App.3d 773, 780 [84 Cal. Rptr. 604]; Guerrero v. Superior Court (1969) 2 Cal. App.3d 136, 140 [82 Cal. Rptr. 443]. (7c) Taking into consideration all of the factors recited, the magistrate concluded that Allinson's belief was reasonable.[4] Excluding Allinson's general experience with destruction of heroin *23 by suspects, there remained other circumstances which were legally sufficient to sustain the ruling.
(6b) "A reviewing court may not substitute its judgment as to the weight of the evidence for that of the magistrate, and, if there is some evidence to support the information, the court will not inquire into its sufficiency.... Every legitimate inference that may be drawn from the evidence must be drawn in favor of the information." (Rideout v. Superior Court (1967) 67 Cal.2d 471, 474 [62 Cal. Rptr. 581, 432 P.2d 197].)
The order is reversed.
Files, P.J., and Jefferson, J., concurred.
NOTES
[1] The driveway led to a parking lot at the rear of the two apartment buildings.
[2] Penal Code section 844: "To make an arrest ... a peace officer, may break open the door or window of the house in which the person to be arrested is ... after having demanded admittance and explained the purpose for which admittance is desired."
[3] Allinson's use of a key to enter the apartment was a "breaking" within the meaning of section 844. Therefore, he was required to comply with the statute by announcing himself before entering. Since he did not do so, the entry was illegal unless noncompliance was justified. People v. Hamilton (1967) 257 Cal. App.2d 296, 302 [64 Cal. Rptr. 578] (disapproved on other grounds in People v. Bradley (1969) 1 Cal.3d 80, 88 [81 Cal. Rptr. 457, 460 P.2d 129]).
[4] "THE COURT: The fact that they were in the bathroom where the cutting took place, the fact that Mr. Dye had tried to dispose of narcotics on a prior occasion. The total accumulative effect of all the evidence compels me to conclude it was reasonable. I feel he had a good faith belief narcotics were to be destroyed, and I also find that the evidence that was before him would lead a reasonable person to believe that the evidence would be destroyed, taking into consideration his knowledge of the individuals involved, the type of crime."