[Crim. No. 3219.   First Dist., Div. One.   Nov. 2, 1956.]

THE PEOPLE, Respondent, v. RUDY HEN CHIN, Appellant.

Edward T. Mancuso, Public Defender (San Francisco), and Joseph McNamara, Deputy Public Defender, for Appellant.

Edmund G. Brown, Attorney General, Clarence A. Linn, Assistant Attorney General, and William M. Bennett, Deputy Attorney General, for Respondent.

WOOD (Fred B.), J.—An officer experienced in the enforcement of the narcotics laws[1] knew defendant Rudy Chin and knew Chin to be a user of narcotics.[2] He had an agent working under him who was buying narcotics from one McNamara and reported that McNamara twice took the agent to the vicinity of a certain hotel and told the agent that McNamara's connection was a Chinese by the name of Rudy. About two hours before going to that hotel, the officer interviewed a Chinese informant (one who had given reliable information on previous occasions and who was known to the officer as an associate of Rudy Chin) and asked the informant if he knew where Rudy Chin lived. The informant said that Rudy Chin lived at Room 34 of the hotel mentioned, adding that Chin was a source of supply to McNamara.

Acting upon this information, the officer, with two policemen,[3] proceeded to Room 34. One of the policemen took a position in the corridor opposite the door to Room 34. The officer who knew Chin, accompanied by the other policeman, went to a lightwell outside of and adjoining Room 34. Looking from the lightwell through a window into Room 34, the officer observed[4] Chin in the room, reclining on a bed, awake. On a dresser table near the bed, the officer saw two small

[1] He had served with the Federal Narcotics Bureau for four years and had made between 300 and 400 arrests for possession of heroin.

[2] About five months prior to the arrest herein the officer visited the defendant in a downtown hotel room and observed defendant taking a "fix," by looking over the skylight in the room.

On that occasion the defendant told the officer he was on probation or parole from the state penitentiary on a narcotics charge and admitted he was addicted.

On the following day the officer learned that defendant had moved from that hotel, and later learned that within the following five months defendant did not report to his probation or parole officer and was wanted on that charge.

[3] Each of the two was a member of the San Francisco Police Department. One of them was attached to the Special Services of that department, his duties being the enforcement of the California laws relating to narcotics.

[4] It was about 12:30 a.m. but the room was lighted by an overhead light.

The window and shade were raised about six inches from the bottom.

white packets wrapped in bindle shape; also, an object which was covered with tissue paper. The officer thereupon formed the opinion that the two white packets were probably bindles of heroin.[5]

The policemen who accompanied the officer then raised the window and the shade further and the officer told Chin he was under arrest and instructed him to open the door and not touch anything on the dresser. Chin immediately complied. The three officers entered the room. One of them immediately handcuffed the defendant and another seized the two white packets (which later upon chemical analysis proved to contain heroin) and the paper covered object (which consisted of a hypodermic needle, a syringe and a spoon, known as a narcotics "outfit").

Under these circumstances it is manifest that the finding of the trial court (the case was tried without a jury, a jury having been waived) that the arrest, the search and the seizure were legal (despite the lack of a search warrant) is amply supported by substantial evidence that "a felony . . . [had] in fact been committed, and . . . [that the arresting officers had] reasonable cause for believing the person arrested [defendant Rudy Chin] to have committed it" (Pen. Code, § 836, subd. 3), and that the bindles of heroin and the narcotics "outfit" were admissible in evidence, having been legally seized.[6]

---

[5]They were of the same shape and appearance as heroin in small quantities had been packaged in 99 per cent of the cases in which the officer had seized heroin packaged in small quantities.

. [6]The state urges as an additional basis for the conclusion that this seizure was legal, the fact that the defendant was a state parole violator, which, assertedly, furnished sufficient cause to justify the entry into appellant's room, his arrest, and the seizure of contraband found therein, invoking *People* v. *Denne*, 141 Cal.App.2d 499 [297 P.2d 451].

The doctrine of the Denne case is not applicable here. There is no evidence, and no claim by the state, that any officer who participated in making the arrest and seizure herein was a state parole officer, much less a state parole officer who had jurisdiction over defendant as a parolee. This is in marked contrast to the situation which obtained in the Denne case. There "parole officer Haydis took over the supervision of defendant's activities as a parolee" (on behalf of the Adult Authority) and "had about 15 personal visits with defendant;" later received disquieting information concerning the defendant; went to the latter's apartment and inspected it, gaining entrance by aid of the building manager; found marijuana and then went to the defendant's place of employment and took him into custody.

That was justified by the following factors (absent from the instant case):

"It is unnecessary for a parole officer to apply for a warrant to 'arrest' a parolee who is already his prisoner and who is at all times

■ "There is a substantial agreement in the decisions of the courts as to what constitutes probable cause or reasonable cause such as will justify one in arresting or prosecuting another upon a criminal charge; and perhaps as clear and comprehensive a statement of the rule as can be found is that of Shaw, C. J., in *Bacon* v. *Towne*, 4 Cush. [58 Mass.] 217: '*There must be such a state of facts,*' said he, '*as would lead a man of ordinary care and prudence to believe, or entertain an honest and strong suspicion, that the person is guilty.*' " (*People* v. *Kilvington*, 104 Cal. 86, 92 [37 P. 799, 43 Am.St. Rep. 73]; emphasis added. See also *People* v. *Martin*, 45 Cal. 2d 755, 761-762 [290 P.2d 855]; *Willson* v. *Superior Court*, 46 Cal.2d 291, 295-296 [294 P.2d 36]; *People* v. *Maddox*, 46 Cal.2d 301, 304 [294 P.2d 6]; *People* v. *Rodrigues*, 140 Cal.App.2d 865, 869 [296 P.2d 38]; *People* v. *Moore*, 140 Cal. App.2d 870, 871-874 [295 P.2d 969]; *People* v. *Soto*, 144 Cal. App.2d 294, 298-302 [301 P.2d 45].) ■ Reasonable cause to justify an arrest is not necessarily limited to evidence that would be admissible on a trial of the issue of guilt. It may include information received from others. (*People* v. *Boyles*, 45 Cal.2d 652, 656 [290 P.2d 535]; *Willson* v. *Superior Court, supra*, 46 Cal.2d 291, 294-295; *Trowbridge* v. *Superior Court*, 144 Cal.App.2d 13, 17-18 [300 P.2d 222].) ■ Looking through a window does not constitute an unreasonable search. (*People* v. *Martin, supra*, 45 Cal.2d 755, 762; *People* v. *Moore, supra*, 140 Cal.App.2d 870, 871.)

These cases exemplify and apply long established principles of logic and of law, illustrated illuminatively by the inimitable opinion which flowed from the facile pen of Georgia's Chief Justice Bleckley some 8 and 60 years ago: "A social, genial gentleman, fond of company and a glass, by occupation a cigar-maker, who keeps his sleeping apartment with the doors 'blanketed' in a fit condition for privately gaming therein,

*in custodia legis.* . . . A parole officer's physical apprehension of his prisoner for suspected violation of parole is not an 'arrest' in the sense that a peace officer arrests a private individual suspected of a crime but a mere transfer of the subject from constructive custody into actual or physical custody. Having constructive custody of his prisoner at all times, there is nothing unreasonable in a parole officer's search of the prisoner's premises where, as here, he has reasonable cause to believe the parole has been breached. . . . It is our conclusion, therefore, that the search being a reasonable one because of the information possessed by the parole officers that defendant was associating with Leonard, who was both a felon and currently engaged as a narcotic peddler, and had thereby broken his faith with the prison authorities, there is no foundation for the contention that defendant's constitutional rights were violated." (P. 510 of 141 Cal.App.2d.)

and who invites his friends at night to refresh themselves with beer, but has in the room, besides barrel and bottles, a table suitable for gaming, together with eleven packs of cards and two boxes of 'chips,' one containing eighty chips and the other three hundred, and a memorandum book with names and numbers entered in it, and whose guests, or some of them, retire hurriedly under the bed on being surprised by a visit from the police at one o'clock in the morning, may or may not be guilty of the offense of keeping a gaming-house. A verdict of guilty based on these and other inculpatory facts, such as the rattle of chips and money, and some expressions about seven dollars and twelve dollars heard by the police on approaching the premises, is warranted by the evidence, and is not contrary to law.'' (*Pacetti* v. *State of Georgia* (Nov., 1888), 82 Ga. 297-298 [7 S.E. 867].)

The judgment and the order denying a new trial are affirmed.

Peters, P. J., and Bray, J., concurred.