[Crim. No. 8126.   Second Dist., Div. Two.   Dec. 21, 1962.]

THE PEOPLE, Plaintiff and Respondent, v. WALTER MORRIS, JR., et al., Defendants and Appellants.

Harold Cutler, under appointment by the District Court of Appeal, for Defendants and Appellants.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Walter E. White, Deputy Attorney General, for Plaintiff and Respondent.

HERNDON, J.—This appeal is taken by defendants following their conviction of possession of heroin in violation of section 11500 of the Health and Safety Code. Appellants waived a jury trial, and pursuant to stipulation, the cause was duly submitted upon the evidence contained in the transcript of the preliminary hearing. The sole question presented for our consideration is the lawfulness of the search and seizure made in this matter. Neither defendant testified. We shall summarize the uncontradicted testimony of the arresting officers.

On January 6, 1961, Officer Westbrook and his partner, Officer Kellough, were advised by detectives at the University Station that a warrant was outstanding for the arrest of one Lynda Ashley upon a charge of forgery. The named officers were advised also that the wanted party resided at 4194 Garthwaite, Los Angeles, but that when other officers had called at said address a few days earlier and identified themselves as police officers, they heard the rear door slam and had been unsuccessful in contacting the wanted party. Officers Westbrook and Kellough went to the designated address at about 1 a. m. on January 7, 1961.

The officers went up the front steps and proceeded to the front door. It was dark, but a light was on in the front room. Officer Westbrook knocked on the door and the officers waited two or three minutes. Officer Westbrook heard voices emanating from inside. Westbrook then told his partner to go around back, remembering the experience of the officers who previously had been there on the same mission.

Officer Kellough proceeded around the apartment to the rear door. Officer Westbrook waited about a minute and then knocked again. Thereupon a person inside with a male voice asked, "Who is it?" Westbrook replied, "Police officers. Open the door." The person inside said, "One minute, Officer." The officer stood waiting for another two or three minutes.

Meanwhile, Officer Kellough had proceeded to the rear door, observing that it had a plate glass window which was not curtained. He looked through the window into the apartment and saw appellants Sanders and Morris hurrying toward the rear door. Officer Kellough, whose training and experience in narcotics matters had been extensive, observed appellant Sanders following closely behind, and a little to one side, of Morris with a piece of wrapped brown paper and a spoon in his left hand. Appellant Morris arrived at the rear door, unlocked and opened it. He stepped forward, whereupon Officer Kellough pushed him back inside the kitchen, saying, "All right, let's get back inside." Sanders, who was two or three feet behind Morris, immediately rushed into the dining room and placed the brown paper and spoon on a small table. Officer Kellough then had appellants Morris and Sanders accompany him to the front living room and had Morris let his partner in. Officer Westbrook then entered the living room. The spoon that had been placed upon the table was found to be burnt upon its underside and the wrapped brown paper contained a piece of cotton and a hypodermic kit with a needle. Numerous balloons of white powder were also found on this table.

With everyone present, Officer Kellough then searched Sanders and found in his pocket a red balloon. Kellough opened the red balloon and found that it contained a white powdery substance. He then spoke to appellant Sanders, who freely and voluntarily said: "Look's like I'm going again. I have been using this stuff for several months. I can't tell you where I got it from. You know that. I don't know how this balloon got in my pocket." During this conversation, Morris was within a couple of feet of Officer Kellough and appellant Sanders. Kellough arrested and handcuffed Sanders. After the first conversation, Kellough asked Sanders the nature of the substance in the red balloon and he replied, "This is not heroin. It is cocaine."

Officer Westbrook questioned Morris concerning the plastic bag and the balloons of white powder, asking, "Where did

you get this stuff? Appellant Morris replied, "You know I can't tell you that, Officer." Westbrook also asked him whether he used narcotics and Morris answered that he did but that he was not "hooked." This conversation also took place in the living room, Morris conversing freely and voluntarily with appellant Sanders standing about 6 feet away.

Officer Westbrook started to search appellant Morris, and as the officer approached his right front trouser pocket, he said, "Wait, Officer. I have an outfit in my pocket. Don't stick your hand in there because you might get stuck." The officer put his hand in slowly and removed an eye dropper attached to a hypodermic needle. The eye dropper was three-fourths full of a white liquid. The officers collected a number of articles, including the red balloon recovered from Sanders' pocket, transported them to Central Property Section and booked them as evidence. The powder in the red balloon was subsequently analyzed as being heroin.

Manifestly, the conduct of the arresting officers was most reasonable in every particular. In fact, in their brief, and before the trial court, appellants appear to have directed practically all of their argument to their assertions that the officers were unfamiliar with the case against Lynda Ashley and had made no attempt to verify that she lived at the address indicated. Not only is there no contention that the testimony of the officers is untrue in any particular, but more to the point, the testimony with regard to the fugitive Ashley was introductory and served only to explain and justify the officers' visit to the premises.

After they waited in vain for the first knock to produce an answer, the officers decided to guard against suffering the experience of officers who called at this address earlier. Officer Kellough was dispatched to watch the rear. As he arrived at the rear exit, Officer Kellough looked through the kitchen window and saw the appellants, Morris and Sanders, beating a retreat toward the rear as an officer of the law called at the front, Sanders carrying in his left hand a piece of wrapped brown paper and a spoon.

The test as to the existence of reasonable or probable cause has been stated as follows in *People* v. *Steffano,* 177 Cal. App.2d 414, 417 [2 Cal.Rptr. 176] ; "Reasonable or probable cause is shown when a man of ordinary care and prudence, knowing what the officer knows, would be led to believe or conscientiously entertain a strong suspicion of the guilt of

278

the accused." ▮ Reference to numerous comparable cases remove any doubt that the facts known to Officer Kellough and the actions of appellants, which the officer saw through the window, were more than sufficient to cause a man of ordinary care and prudence to entertain a strong suspicion that appellants were guilty of criminal conduct. (*People* v. *Hart*, 177 Cal.App.2d 484, 485-486 [2 Cal.Rptr. 226] ; *People* v. *Pendarvis*, 178 Cal.App.2d 239, 241 [2 Cal.Rptr. 824] ; *People* v. *Gardner*, 177 Cal.App.2d 43, 45-46 [1 Cal.Rptr. 830] ; *People* v. *Steffano, supra*, 177 Cal.App.2d 414, 415-418 ; *People* v. *Taylor*, 174 Cal.App.2d 448, 451 [344 P.2d 837] ; and *People* v. *Garnett*, 148 Cal.App.2d 280, 283 [306 P.2d 571].)

▮ That the arresting officer properly took into account the actions of appellants which he observed through the window is beyond question. Since looking through a window does not constitute an unreasonable search, (*People* v. *Martin*, 45 Cal.2d 755, 762 [290 P.2d 855]) the officer was certainly entitled to act upon the furtive conduct observed and halt appellants in their attempted flight as Morris stepped outside the rear door. ▮ "He was not arrested at that point; merely detained for the purpose and during the time of making reasonable inquiries ; such a detention does not in and of itself amount to an arrest." (*People* v. *Amos*, 190 Cal.App.2d 384, 388 [11 Cal.Rptr. 834].) ▮ When, immediately thereupon, Sanders was observed divesting himself of the articles he had sought to remove from the premises in his flight, it was entirely proper for the officer to enter through the open door and examine these hastily disposed of objects. (Cf. *People* v. *Andrews*, 153 Cal.App.2d 333, 338 [314 P.2d 175] ; *People* v. *Edwards*, 142 Cal.App.2d 419, 420 [298 P.2d 664] ; *People* v. *Almarez*, 190 Cal.App.2d 380, 382 [12 Cal. Rptr. 111] ; *People* v. *Hart, supra*, 177 Cal.App.2d 484, 485-486.)

▮ This application of the rules regarding search and seizure in no way conflicts with the recent expressions of the United States Supreme Court on the subject in *Chapman* v. *United States*, 365 U.S. 610 [81 S.Ct. 776, 5 L.Ed.2d 828]. Although as a general rule a residence may not be searched without a search warrant unless the search is incident to a lawful arrest, there are situations in which this rule does not apply to limit or circumscribe reasonable and necessary action by officers of the law. The court in the *Chapman* case, at

page 615, quoting in part from *Johnson* v. *United States,* 333 U.S. 10 [68 S.Ct. 367, 92 L.Ed. 436], stated:

"Here, as in that case, 'No reason is offered for not obtaining a search warrant except the inconvenience to the officers and some slight delay necessary to prepare papers and present the evidence to a magistrate. These are never very convincing reasons and, in these circumstances, certainly are not enough to by-pass the constitutional requirement. *No suspect was fleeing or likely to take flight.* The search was of permanent premises, not of a movable vehicle. *No evidence or contraband was threatened with removal or destruction, . . .'* " (Emphasis added.)

In the instant case the evidence is undisputed that appellants' actions were such as to indicate to the officers that these suspects were about to take flight in possession of materials which the officer had good reason to believe consisted of that form of contraband which has become such a scourge to our society that every thoughtful and law-abiding citizen is alarmed and distressed by its dreadful implications. The record here indicates that the experienced police officers performed their difficult and dangerous duties with great competence and in a manner that was both lawful and proper from every reasonable viewpoint.

The judgments and the orders denying motions for new trials are affirmed; the attempted appeal from order denying motion to suppress evidence is dismissed.

Fox, P. J., and Ashburn, J., concurred.