[Crim. No. 8143.    Second Dist., Div. One.    Mar. 19, 1963.]

THE PEOPLE, Plaintiff and Respondent, v. FRANK M. GONZALES, Defendant and Appellant.

Chandler & Duncan and Elinor Chandler for Defendant and Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Louis L. Selby, Deputy Attorney General, for Plaintiff and Respondent.

WOOD, P. J.—In a nonjury trial the defendant was convicted of unlawfully possessing heroin. He admitted an allegation of the information that he had been convicted previously of violating section 11500 of the Health and Safety Code, a felony. He was sentenced to state prison. He appeals from the judgment and sentence.

Appellant contends that the heroin which was received in evidence was obtained by the officer by illegal search and seizure.

Officer Grennan testified in substance, as follows: On August 4, 1961, about 8:15 a.m., he received a telephone call at the narcotics division from Augusto Pimentel, who said that his wife Lupe was living with Frank Gonzales at 607¼ N. Avenue 26, and that Gonzales was a user and seller of heroin, and was supplying Lupe with heroin. Pimentel also said that he was at Gonzales' home the previous evening and had received narcotics from Lupe and injected himself with it; and he agreed to meet the officer and direct him to the location. The officer (witness) and three other officers proceeded at once to a designated place where they met a man who identified himself as Pimentel. The man directed them to said address and told them that this was where his wife and several of her children were living with Gonzales, they having moved there two days previously. Then Pimentel got out of the police car.

Officer Grennan testified further: That prior to receiving this information from Pimentel, he had known a Frank Gonzales, also known as "Little Chevo," for six months, and had known that this man was a user and seller of narcotics and, from checking criminal records, knew that he had been convicted of possessing narcotics. He had known about his activities for two years, having heard his name mentioned constantly by various narcotic addicts and by other officers in the narcotics division. During the six months prior to the ar-

rest, he had kept him under investigation, and two of his former places of residence had been under surveillance. He had received information from various narcotic addicts, from several confidential informants, from two persons who had bought narcotics from him, and from other officers in the narcotics division who also were investigating him.

Officer Grennan also testified: After letting Pimentel out of the police car, two officers went to the front of the apartment while he (witness) and Officer Hanks proceeded to the rear along a walkway which separated the apartment units, and up the back steps onto a long, open balcony which extended the length of the units. They entered a small service porch through a screen door and knocked on a wooden door which was the rear door to the kitchen. While they were standing outside, the door was opened by defendant, and they said: "Police Officers." He (witness) immediately recognized the man as the Frank Gonzales he had known previously, observed his eyes, and saw numerous hypodermic needle marks on the backs of both of his hands. The witness then formed the opinion from this observation that defendant was using heroin illegally, and told him that he was under arrest for illegal use of heroin. Then the two officers (who had gone to the rear) entered the kitchen through the back door. The witness saw Lupe Pimentel lying on the floor, examined her arms and formed the opinion that she was using heroin illegally, and placed her under arrest. He observed, upon the kitchen table, paraphernalia which apparently was a hypodermic outfit—a spoon with a black residue in the bowl and an eye dropper—with only the spike or hypodermic needle missing. When they asked defendant where the spike was, he said that a couple of fellows had been there the night before and had taken it with them. The witness then opened the front door and let the other two officers enter, and they proceeded to search the apartment. Six or eight children were there. About 15 minutes later, he (witness) found a bag of beans on a shelf, within which bag there was a rubber finger stall containing a whitish powder resembling heroin. Defendant said that the stall was his and was the remainder of a quarter ounce of heroin he had bought the day before for $60; but he declined to give the name of the person from whom he had purchased it. The statement by defendant was made freely and voluntarily. He took possession of the finger stall and powder therein, the spoon, and the eye dropper, and placed them in an envelope (People's exhibit No. 1).

Lupe Pimentel testified in substance: That her husband,

Augusto Pimentel, came to her home about 6 p.m. the evening before her arrest, and while there he prepared and used some narcotics which he had in a little rubber balloon. He gave her a "shot" of narcotics, and she also gave some of it to defendant. Her husband had been in the kitchen near the bag of beans, but she did not see him put anything into the bag. They had quarreled—he wanted her to leave defendant and come back to him, and he threatened that she would regret it all her life for he would get defendant out of the way one way or another. A window of the bathroom opened onto the back porch, and on the porch there were a washing machine, some clothes, and a water heater. She did not know whether the screen door to the back porch could be locked. All of her children were with her on the day of her arrest, and she told a 7-year-old boy to tell Officer Grennan that the balloon "belonged to Gus [Pimentel]."

Defendant testified in substance: The rent he paid included the service porch and no one in the apartment had access to, or use of, it except his family. He thought the door to the screened porch was a screen door with some kind of latch on it but he was not sure that the door could be locked, and he was not sure there was glass in the windows on the screened porch. On the day of his arrest he had not given anyone permission to enter the back porch. He first saw Officer Grennan when he heard a knock and opened the door. He did not know there was heroin in the bag of beans. He was present while the officers searched the back porch, but he was in the front room handcuffed while they searched the kitchen, and when, about 15 minutes later, they showed him the finger stall. He told them that the stall was his, because they told him they would arrest Lupe and take the children to jail if he did not admit it was his. He had known Pimentel about one and a half months; and on the preceding night he had seen the finger stall narcotics "on him," and he (defendant) and Lupe had used some of the narcotics. He did not pay Pimentel for the narcotics, and he did not tell the officers that he had bought the heroin the preceding day for $60. Pimentel was the source of supply for the narcotics, but he did not tell the officers that, because he did not want to inform on him and cause his arrest. He had not known until the preliminary hearing that Pimentel was the person who gave the police the information about his activities. On cross-examination he said he had been convicted of a felony in 1954; he was using three or four "caps" of heroin a day, and was living with Lupe although not married to her.

On rebuttal Officer Grennan testified that on the day of the arrest, as a result of conversations with Lupe, he made an arrest of two other persons; he did not tell defendant he would arrest Lupe and the children unless defendant admitted ownership of the narcotics. Lupe was already under arrest, and some of the children had been badly beaten and were being taken into the custody of the juvenile authorities.

The officers did not have a search warrant or a warrant of arrest.

Appellant contends that the heroin should not have been received in evidence, for the reason that it was obtained by illegal search and seizure. He argues that the officers illegally entered the screened porch, which was a part of his dwelling house, and that the heroin which the officers found in the kitchen, after appellant opened the kitchen door, was illegally obtained in that the officers had entered the porch without his permission, without a search warrant, and without reasonable cause for arresting him or anyone in the house.

As above stated, before the officers went to defendant's apartment or house, they had considerable information to the effect that defendant was a user and seller of narcotics. Augusto Pimentel, who gave some of the information, was not known as a reliable informer. Officer Grennan, who testified that he had received some of the information from other informers, declined to disclose the names of those persons. Under such circumstances the information was not sufficient to constitute reasonable cause for entering appellant's apartment. The information was sufficient, however, to justify the officers in making an investigation by going to the apartment and seeking an interview with defendant. (See *People* v. *Michael*, 45 Cal.2d 751, 754 [290 P.2d 852].) The screened porch is not well described in the record—the officer witness referred to it as a small service porch with a screen door—neither the witness Lupe Pimentel nor the defendant knew whether the door could be locked. There was no evidence that the screen door was locked. The two officers, who went to the rear of the apartment, opened the screen door, walked across the porch, and knocked on the kitchen door. There was no evidence that their entering upon or walking across the porch was done in any manner that was destructive of or injurious to property, or in any manner that was indicative of oppressiveness in investigating an alleged violation of law. Their act in entering and walking upon the porch was a technical trespass, but it was not related materially to the search which occurred after defendant had

opened the kitchen door. In *People* v. *Boyles,* 45 Cal.2d 652 [290 P.2d 535], officers, using a key they obtained from a hotel manager, entered a room in the hotel and awaited the arrival of the defendant. When defendant knocked on the door, the officers opened the door, and one of them grabbed defendant's hand and found heroin therein. It was said in that case (p. 654) : " [W]hether or not the officers were tres-passers in the room where they waited for defendant is imma-terial in this case. It does not appear that the room was searched. . . . Under these circumstances, the trespass, if any, was entirely unrelated and collateral to the securing of the evidence to which defendant objects, and it could not therefore render that evidence inadmissible."

In the present case, after an officer had knocked on the kitchen door, the officers said, "Police officers." Then, while the officers were standing outside the door, Officer Grennan recognized defendant as the Frank Gonzales he had known, and he saw numerous hypodermic-needle marks on the backs of defendant's hands. Thereupon, as a result of that observa-tion, Officer Grennan formed the opinion that defendant was using heroin illegally, and placed him under arrest. The of-ficers then entered the kitchen. Officer Grennen saw Lupe Pimentel lying on the floor, and he examined her arms and, after forming the opinion that she was using heroin illegally, placed her under arrest. Upon the kitchen table there was a hypodermic outfit—including an eye dropper, and a spoon with a black residue in it. As a result of searching the kit-chen, a finger stall containing heroin was found in a bag of beans. Defendant said that the stall was his and that the sub-stance therein was the remainder of some heroin he had bought for $60. The officers had reasonable cause for arresting de-fendant and entering the kitchen. The arrest and search were lawful. It was established that the white substance in the fin-ger stall was heroin. The heroin and other parts of exhibit 1 were admissible in evidence. The evidence was sufficient to support the conviction.

 "The judgment and sentence are synonymous." (*People* v. *Ross,* 206 Cal.App.2d 542, 543 [24 Cal.Rptr. 1].)

The judgment is affirmed.

Fourt, J., and Lillie, J., concurred.