[Crim No. 5026.   First Dist., Div. One.   Nov. 22, 1965.]

THE PEOPLE, Plaintiff and Appellant, v. JESSE
WILLARD, Defendant and Respondent.

Thomas C. Lynch, Attorney General, Albert W. Harris, Jr., Assistant Attorney General, and Jennifer L. Bain, Deputy Attorney General, for Plaintiff and Appellant.

John D. Nunes, Public Defender, James C. Hooley, Chief Assistant Public Defender, and Richard M. Bryan, Assistant Public Defender, for Defendant and Respondent.

SULLIVAN, P. J.—Defendant was charged in an information with possession of heroin. His motion to set aside the information was granted (Pen. Code, § 995) and the People appeal.

At the preliminary hearing Sergeant Hilliard of the Oakland Police Department and assigned to its narcotic detail testified that on August 27, 1964, at about 1 a.m. he and two other police officers went to a single-story duplex house at 5902 Holway Street, Oakland, to make a narcotics investigation. Some 15 minutes earlier, Hilliard had received a telephone call from an informant who stated that Sylvia Chandler and James Lucas were living at the Holway Street address;[1] that Miss Chandler was in possession of heroin; and that defendant was going to the house to see if he could get some of the heroin to take to San Francisco to sell.

At that time Sergeant Hilliard was already in possession of additional information concerning the above parties which he had received from a second informant over the preceding three or four months. This information was to the effect that Lucas and Miss Chandler were in possession of and selling

---

[1]Hilliard actually was given only Miss Chandler's telephone number from which he later traced her address through telephone company records.

heroin; that Lucas had been selling heroin for at least three or four months in a specified area; that on numerous occasions within the week preceding August 27 defendant had been observed with Lucas in that area; that the two men had been observed there together in a two-tone green Oldsmobile; and that Miss Chandler was in possession of narcotics that very day. Defendant, Lucas and Miss Chandler were all known to the witness as persons involved in the narcotics traffic. He had arrested defendant in the past ''for investigation of possession of narcotics'' and knew that defendant had been convicted of possession of narcotics paraphernalia.

When the officers arrived at the Holway Street premises on the night in question, Sergeant Hilliard saw two men in a green Oldsmobile parked in front of the house and noticed that it was the same car in which he had seen defendant on several prior occasions. Hilliard walked to the front of the house to verify the address and as he approached the east side he heard voices coming from the rear area which was lighted. He then saw Sylvia Chandler come out the back screen door, go to the garbage can and reenter the house.

Hilliard further testified that he thereupon went down to the corner to contact his two fellow officers and all three returned to the Chandler residence. All of them were in plain clothes. They walked to the rear of the house and entered onto the property by passing through an open gate. They walked along the side of the house to the back porch area[2] whereupon Officer Hilliard stepped up onto the first step, his fellow officers remaining on the sidewalk. This step was approximately one foot off the ground and while standing on it Hilliard could look through a screen door into the kitchen— the back door itself being wide open. Officer Hilliard's purpose in going there was to conduct an investigation, although upon arrival the officers were as quiet as possible so as not to inform the occupants of the house that they were there. There were no bushes or hedges nearby, no roof over the porch, no way for the officers to conceal themselves: they were just ''standing there,'' the other two officers on the sidewalk and Hilliard upon the step. Anyone looking out the window or door would have seen them.

---

[2]There is no door actually located at the rear of the house. The ''back door is actually on the side of the house.'' Nevertheless, since the parties at the preliminary hearing referred to it as the back door, likewise will we.

After a few minutes Hilliard observed Miss Chandler enter the kitchen from the front area of the house, followed shortly thereafter by defendant. The latter walked over and stood next to Miss Chandler and told her of his desire to take some of the "stuff" with him to San Francisco where he was sure he could get rid of it. Miss Chandler replied, "Well, I don't have that much stuff. He didn't leave me very much this time." Defendant then said "Well, while I am here I might as well try some of the stuff." Miss Chandler replied "Okay" and with this disappeared to the rear of the house, out of Hilliard's view. Moments later she returned into view and walked over to defendant; he in turn got a glass from the cabinet, filled it with water and walked toward the rear of the house. For a brief time, then, defendant was out of Hilliard's observation.

A moment later a light came on in a window immediately alongside Hilliard's head. Looking toward it Hilliard could see that it was the bathroom and additionally could see defendant therein, standing by the wash basin. He watched defendant "then take a white paper, remove the contents and put it in a spoon, light a match under the spoon, remove an eyedropper and hypodermic needle from his sweater pocket, draw the contents off the spoon and inject it in his arm." While defendant was in the process of doing this Hilliard turned around and told Officers Romero and Sawdon what he saw going on and that as soon as defendant finished and walked into the kitchen the officers would immediately enter the house and arrest him.

After defendant "had finished injecting a substance into his arm and had folded a small bindle of paper and placed it in his shirt pocket and then was putting something into his sweater pocket," Hilliard glanced toward the kitchen and saw Miss Chandler start walking towards the screen door. The sergeant then opened the screen door, stepped into the kitchen, around Miss Chandler and went into the bathroom where he placed defendant under arrest for investigation of possession of heroin. He led defendant by the wrist into the kitchen where he instructed Officer Romero to search him while he held him by the wrist. This search turned up a small package in defendant's shirt pocket, which package was later stipulated to contain heroin.

No consent was asked for nor obtained by Hilliard before entry into the house itself or into the bathroom. Nor had the

officers procured either an arrest warrant or a search warrant.

Exercising the privilege granted by Code of Civil Procedure section 1881 subdivision 5[3] the police refused to disclose the names of the two above-mentioned informants. As a result the magistrate at the preliminary hearing treated the information as being from an anonymous unreliable informant.

At the conclusion of *voir dire* examination of Sergeant Hilliard by defendant, defense counsel moved to strike all of the testimony of the witness pertaining to his observations of the occupants of the house and the conversations he heard upon the ground that such testimony was the "product of illegal police activity" violative of defendant's rights under the Fourth Amendment. Defendant also objected to the introduction of the heroin on the ground that it was the product of an illegal search and seizure. The motion was denied and the objection overruled.[4]

The crucial question confronting us on this appeal is whether the acts of Sergeant Hilliard in entering the back yard of the premises and in looking from the porch step into the interior of the house constituted an illegal search in violation of defendant's rights guaranteed by the Fourth Amendment.

In *Bielicki* v. *Superior Court* (1962) 57 Cal.2d 602, 605 [21 Cal.Rptr. 552, 371 P.2d 288], the court gave the following explanation of the term "search" as used in the Fourth Amendment of the United States Constitution and in article I, section 19 of the California Constitution: " '[T]he term implies some exploratory investigation or an invasion and quest, a looking for or seeking out. . . . A search implies a prying into hidden places for that which is concealed and that the object searched for has been hidden or intentionally put out of the way.' [Citation.] The constitutional guarantees, of course, prohibit not all searches but only those that are 'unreasonable.' [Citations.] And '[t]here is no formula for the determination of reasonableness. Each case is to be

---

[3]Code of Civil Procedure, section 1881, subdivision 5, provides: "A public officer cannot be examined as to communications made to him in official confidence, when the public interest would suffer by the disclosure."

[4]In making these rulings the magistrate observed that Sergeant Hilliard "made a simple trespass of the premises" in the course of an investigation and that the officer made an entry not because of the information he had received but because of what he saw and heard while looking through an open door and a window.

decided on its own facts and circumstances.' [Citations.]''
(In accord: *People* v. *Norton* (1962) 209 Cal.App.2d 173, 176-177 [25 Cal.Rptr. 676]; *People* v. *Young* (1963) 214 Cal.App.2d 131, 134-135 [29 Cal.Rptr. 492]; *People* v. *King* (1965) 234 Cal.App.2d 423, 428 [44 Cal.Rptr. 500]; *People* v. *Green* (1965) 235 Cal.App.2d 506, 511 [45 Cal.Rptr. 371]. For other cases using the same definition of ''search'' see: *People* v. *West* (1956) 144 Cal.App.2d 214, 219 [300 P.2d 729]; *People* v. *Ambrose* (1957) 155 Cal.App.2d 513, 522-523 [318 P.2d 181]; *People* v. *Spicer* (1958) 163 Cal.App.2d 678, 683 [329 P.2d 917]; *People* v. *Amos* (1961) 190 Cal.App.2d 384, 391 [11 Cal.Rptr. 834]; *People* v. *Rayson* (1961) 197 Cal.App.2d 33, 39 [17 Cal.Rptr. 243]; *Mardis* v. *Superior Court* (1963) 218 Cal.App.2d 70, 74-75 [32 Cal.Rptr. 263].)

The rule is settled in California that ''looking through a window does not constitute an unreasonable search.'' (*People* v. *Martin* (1955) 45 Cal.2d 755, 762 [290 P.2d 855]; *Bielicki* v. *Superior Court, supra,* 57 Cal.2d 602, 607; *People* v. *Moore* (1956) 140 Cal.App.2d 870, 871 [295 P.2d 969]; *People* v. *Hen Chin* (1956) 145 Cal.App.2d 583, 586 [303 P.2d 18]; *People* v. *Amado* (1959) 167 Cal.App.2d 345, 347 [333 P.2d 254]; *People* v. *Steffano* (1960) 177 Cal.App.2d 414, 417 [2 Cal.Rptr. 176]; *People* v. *Covan* (1960) 178 Cal.App.2d 416, 418 [2 Cal.Rptr. 811]; *People* v. *Feeley* (1960) 179 Cal.App.2d 100, 105 [3 Cal.Rptr. 529]; *People* v. *Morris* (1962) 211 Cal.App.2d 274, 278 [27 Cal.Rptr. 129]; *People* v. *Earl* (1963) 216 Cal.App.2d 607, 610 [31 Cal.Rptr. 76]; *People* v. *Murray* (1963) 218 Cal.App.2d 317, 320 [32 Cal.Rptr. 348]; *People* v. *Holloway* (1964) 230 Cal.App.2d 834, 839 [41 Cal.Rptr. 325]; *People* v. *Aguilar* (1965) 232 Cal.App.2d 173, 176 [42 Cal.Rptr. 666]; *People* v. *King, supra,* 234 Cal.App.2d 423, 429.)[5]

Defendant contends that the above rule can have no application in the instant case, arguing that since, under the holdings in *Bielicki* v. *Superior Court, supra,* 57 Cal.2d 602 and *Britt* v. *Superior Court* (1962) 58 Cal.2d 469 [24 Cal.Rptr. 849, 374 P.2d 817], peering into enclosed toilet stalls in

---

[5]The same rule applies to windows of automobiles. (*People* v. *Hyde* (1958) 51 Cal.2d 152, 157 [331 P.2d 42]; *People* v. *Terry* (1964) 61 Cal.2d 137, 152 [37 Cal.Rptr. 605, 390 P.2d 381]; *People* v. *Wright* (1957) 153 Cal.App.2d 35, 38 [313 P.2d 868]; *People* v. *Carnes* (1959) 173 Cal.App.2d 559, 566 [343 P.2d 626] *People* v. *Eychas* (1960) 182 Cal.App.2d 360, 363 [6 Cal.Rptr. 110]; *People* v. *Myles* (1961) 189 Cal.App.2d 42, 47 [10 Cal.Rptr. 733].)

public restrooms was an unconstitutional invasion of privacy, "*a fortiori,* peering into a private bathroom is an unreasonable search." In *Bielicki,* the police conducted a surveillance of homosexual activity from the roof of a public restroom by looking into the enclosed toilet stalls through a small pipe installed in the ceiling; in *Britt,* the police conducted a similar surveillance by watching through vents in the ceiling. Both cases held that the observations therein made by the police constituted an impermissible search. But, contrary to defendant's claim, neither decision involved an application of the rule dealing with looking through a window, in fact *Bielicki* specifically stated that "the present case is not governed by the settled rule that 'looking through a window does not constitute an unreasonable search' (*People* v. *Martin* (1955) 45 Cal.2d 755, 762 [290 P.2d 855] . . .)." (P. 607.) As we observed in *People* v. *Norton, supra,* 209 Cal. App.2d 173, 175-176, "the factual essence in *Bielicki* was the clandestine observation by the police of a place which by its very physical appointments provided privacy to its occupant. . . . Such surveillance therefore, because of the character of the place to which it was directed, of necessity invaded the occupants' constitutionally guaranteed right of privacy. The activities observed by the police in *Bielicki* were such that no other member of the public could have seen them, since they were carried on in toilet booths fully enclosed by three walls and a door." (But cf. *Smayda* v. *United States* (9th Cir. 1965) 352 F.2d 251.)

Since, therefore, neither *Bielicki* nor *Britt* was governed by the rule declared in *Martin,* there can be no room here for the argument that the first two cases had a restrictive effect on such rule in situations involving toilets or bathrooms so as to afford such areas of a house special protection and thus immunity from the rule. It makes no difference under the rationale of the cases that an observation is made through a bathroom window rather than a frontroom window (*People* v. *Feeley, supra,* 179 Cal.App.2d 100), a dining room window (*People* v. *Covan, supra,* 178 Cal.App.2d 416) or a window in the rear of the house (*People* v. *Steffano, supra,* 177 Cal. App.2d 414; *People* v. *Morris, supra,* 211 Cal.App.2d 274; *People* v. *Holloway, supra,* 230 Cal.App.2d 834). In all instances, the point is that the observer is merely seeing what is plainly visible.

But defendant presses the argument further. While the rule declared in *Martin,* he says, may be applicable where the

activities of the accused are in plain sight, it cannot be invoked where, as in the instant case, the officers have trespassed upon private property in order to make the critical observation. It is defendant's position that *Martin* cannot be broadly interpreted so as to evolve a mechanical rule upholding such observations regardless of their circumstances and that the particular facts of the instant case establish an unlawful invasion of privacy. Defendant urges that the present case is governed by *California* v. *Hurst* (9th Cir. 1963) 325 F.2d 891[6] (reversed on other grounds, 381 U.S. 760 [85 S.Ct. 1796, 14 L.Ed.2d 713]). It is the position of the Attorney General, on the other hand, that Hilliard's observations did not become an illegal search merely because he may have been committing a technical trespass at the time.

It is worthy of note that while a few California cases seem to have given some consideration to the factor of trespass in determining the reasonableness of a search (*People* v. *Wright* (1957) 153 Cal.App.2d 35 [313 P.2d 868]; *People* v. *Andrews* (1957) 153 Cal.App.2d 333 [314 P.2d 175]; *People* v. *Gonzales* (1963) 214 Cal.App.2d 168 [29 Cal.Rptr. 318]; *People* v. *Earl, supra,* 216 Cal.App.2d 607; *People* v. *Holloway, supra,* 230 Cal.App.2d 834), by and large many of the cases dealing with the question of a search arising from "looking through a window" seem to have proceeded on the assumption that a minor or technical trespass not involving physical entry into a building does not derogate from the otherwise reasonable nature of the search. (See *People* v. *Martin, supra,* 45 Cal.2d 755, where officers looked through the rear window of an office building; *People* v. *Moore, supra,* 140 Cal.App.2d 870, where officers looked through apertures of venetian blinds on dining room window; *People* v. *Hen Chin, supra,* 145 Cal.App.2d 583, where an officer looked into defendant's hotel room from an adjoining light-well; *People* v. *Amado, supra,* 167 Cal.App.2d 345, where the officer went to the back door of defendant's residence and looked into defendant's kitchen, the back door being open but a screen door being closed; *People* v. *Steffano, supra,* 177

[6]The trial judge appears to have based his decision to set aside the information at least partially on the *Hurst* case, stating "I have come to the conclusion that our late cases in effect have overruled People against Martin and the other cases, the old California cases which seemed to hold it was all right to look in windows and discover things like that, get in somebody's back yard and look through a window and so forth."

Cal.App.2d 414, where officers went to rear of defendant's house, a triplex, and looked into kitchen through glass panels of rear door; *People* v. *Morris, supra,* 211 Cal.App.2d 274, where, while one officer waited at front door of apartment, the other went around to the rear and looked into the kitchen through uncurtained window of rear door; *People* v. *Murray, supra,* 218 Cal.App.2d 317, where officer went to rear of a commercial building and looked through unpainted portion of window into a men's restroom; *People* v. *Aguilar, supra,* 232 Cal.App.2d 173, where officer went to side window of motel, separated from adjoining sidewalk by a row of bushes, stepped between bushes, crouched down and looked through window into defendant's apartment.)

We proceed to examine briefly those cases cited *supra* which contain some reference to a possible trespass by investigating officers. In *People* v. *Wright, supra,* 153 Cal.App.2d 35, an officer walked up a driveway to defendant's parked car and by shining a flashlight into the rear of the vehicle discovered the stolen property. Applying the *Martin* rule (see fn. 5, *ante*), the court rejected the defendant's contention that the officer was a trespasser, stating that there was no showing as to the ownership of the driveway and that since the car and its occupant were visible from the street, it was not unreasonable for the officer to approach it for a more careful view. In *People* v. *Andrews, supra,* 153 Cal.App.2d 333, an officer conducting a narcotics investigation, having seen the defendants enter a house, walked down an alley and through an opening in a fence, and approached an open window of the house facing the alley. Through this window he saw the defendants committing the offense charged. The court applied the rule of *Martin* and rejected defendants' contention ''that the officer was in an illegal position when he stood at the window, since he had walked five feet over private property; and that . . . [under *Martin*], looking into a window is excusable, under the search and seizure rule, only when the officer is in a place where he has a right to be'' (p. 337) stating: ''In *Hester* v. *United States,* 265 U.S. 57 [44 S.Ct. 445, 68 L.Ed. 898], the court said: 'It is obvious that even if there had been a trespass, the above testimony was not obtained by an illegal search and seizure.' In *Martin* v. *United States,* 155 F.2d 503, the court said: 'The Fourth Amendment secured the people against not all, but only unreasonable searches and seizures of their persons, houses, papers, and effects. Enclosed or unenclosed grounds or open

fields around their houses are not included in the prohibition.' '' (P. 338.)

In *People* v. *Gonzales, supra,* 214 Cal.App.2d 168, while two officers went to the front of defendant's apartment, two other officers went up the back steps, entered a small service porch and knocked on the kitchen door. They had considerable information that defendant was a narcotic addict, which nevertheless did not constitute probable cause for entering the apartment because of the officers' refusal to disclose the names of informants. Subsequent observation of the defendant, who answered the door, did furnish reasonable cause for his arrest and ''Their act in entering and walking upon the porch was a technical trespass, but it was not related materially to the search which occurred after defendant had opened the kitchen door.'' (Pp. 172-173.) In *People* v. *Earl, supra,* 216 Cal.App.2d 607, where the officers entered a hotel and looked into defendant's room through a transom, the court held that ''observing of that which is open and patent is not a search. [Citations.] . . . There was no offer of evidence that the hotel corridors were not open to anyone. Therefore it is presumed that the officers were not trespassers.'' (Pp. 611-612.) In *People* v. *Holloway, supra,* 230 Cal.App.2d 834, where officers looked through the undraped living room window of a rear apartment, the court rejected the contention that evidence was secured as a result of ''illegal trespass, fraud, stealth or deceit'' stating that ''the officers left the sidewalk and crossed a parking lot to the open window. The outside of the building that gave access to the window was an open area which could be frequented by fellow building tenants and others. . . . The officers did not enter a private section of the building to obtain their view, but only witnessed what they saw from a section of the property generally available to the public.'' (Pp. 838-839.)

Thus *Andrews* appears to hold that the rule of the *Martin* case is not rendered inapplicable by the observer's trespass. However, the rest of the foregoing cases alluding to trespass articulate no clear rule and reach no conclusion as to effect of a trespass on evidence thus obtained. But it is noteworthy that among the group of cases cited *supra* which do not discuss the factor of trespass at all but, as we have said, seem to proceed on the assumption that a minor or technical trespass does not abrogate the *Martin* rule, there are several cases the facts of which are susceptible of a conclusion of trespass by the police. The sustaining of the legality of the search in

these cases, therefore, furnishes some indication that California courts have regarded the *Martin* rule as applicable even where such trespass has occurred. Both from what the California cases have said on the subject and what they have not said, we apprehend in them the underlying principle that looking through a window is not an unreasonable search and the search does not necessarily become unreasonable and illegal because the police, while not entering the house, may be on the premises when they make the observation.

Support is given this conclusion by the recent case of *People* v. *King, supra,* 234 Cal.App.2d 423. There officers went to defendant's residence to investigate a narcotics violation. The house was surrounded by a 4½-foot high picket fence and in the fence bordering an alley on one side of the house were two gates for entry to the front and rear doors of the house. The front of the house was 50-65 feet back from the sidewalk and the front porch about 15-20 feet distant from the front gate. The officers went on the front porch and, by stooping, looked into the living room through an adjacent window with a partially drawn blind. It was held in that case that "their action was not an unreasonable invasion of the privacy of the defendants" (p. 500) citing *United States* v. *Polk* (D.C.N.D. Cal. 1961) 201 F.Supp. 555, affirmed 314 F.2d 837, and *California* v. *Hurst, supra,* 325 F.2d 891, 899, the latter case being relied upon by defendant herein. The court said in *King* that "the trial judge was justified in drawing the inference that the picket fence did not prevent a view from the public sidewalk or adjacent premises of the front yard of the defendant King's residence, or prevent entry into that yard, and that the front yard and the front porch were open for the purpose of use as a means of access by all persons having legitimate business with the occupants. The fact that there was an uncovered portion of the window adjacent to the front door through which the officers could see into the living room was not brought about by any act on the part of the officers or third persons. [Citation.] The presence or absence of such an aperture was a matter within the control of the occupants of the house. The open space was at such a point that any person who came upon the porch could have ready access to it." (234 Cal.App.2d at p. 432.)

We now turn to an analysis of *California* v. *Hurst, supra,* 325 F.2d 891, upon which the lower court rested its decision (see fn. 6, *ante*) and upon which defendant heavily relies for

an affirmance herein. Before doing so, it is convenient to observe at this point that the Attorney General relies on *Hester* v. *United States* (1924) 265 U.S. 57 [44 S.Ct. 445, 68 L.Ed. 898] (cited and quoted in *People* v. *Andrews, supra,* 153 Cal.App.2d 333 as we noted *supra*) as support for his position that a possible technical trespass by Sergeant Hilliard in the instant case did not make his observation an illegal search. But the Attorney General has not favored us with any evaluation of *Hester* or any discussion whatsoever of *Hurst* which the record shows was cited by defendant below and relied upon by the trial judge. Nor have we been favored with an appellant's reply brief, although *Hurst* and other authorities have been given detailed treatment in respondent's brief.

It is to be noted that in *Hester* v. *United States, supra,* 265 U.S. 57, the revenue agents concealed themselves from 50 to 100 yards away from defendant's house and from that position saw defendant in possession of the incriminating bottle and jug of moonshine whisky. After making the observation concerning a trespass quoted in *People* v. *Andrews, supra,* 153 Cal.App.2d 333, 338, and relied on herein by the Attorney General, the court in *Hester* said: "The only shadow of a ground for bringing up the case is drawn from the hypothesis that the examination of the vessels took place upon Hester's father's land. As to that, it is enough to say that, apart from the justification, the special protection accorded by the 4th Amendment to the people in their 'persons, houses, papers, and effects' is not extended to the open fields. The distinction between the latter and the house is as old as the common law. 4 Bl. Com. 223, 225, 226." (265 U.S. 57, 59; 68 L.Ed. 898, 900.) *Hester* must be viewed in its true perspective as holding that Fourth Amendment protection does not extend to open fields although, as one writer has pointed out, subsequent judicial interpretation of *Hester* has applied it indiscriminately to a variety of factual situations without precise distinction as to whether the offending entry of the officer was merely upon open fields or to land within the curtilage. (See *The Fourth Amendment and Evidence Obtained by a Government Agent's Trespass,* 42 Neb.L.Rev. 166, 169-172.)

We reach *Hurst,* an appeal by California from an order granting relief in habeas corpus proceedings, instituted as post-conviction review of a judgment affirmed by the California District Court of Appeal. In that case the police

received information from an anonymous informant that marijuana could be found under a specified dwelling house. Upon arrival, Officer Garrahan went to the front door, Officer Hanks to the rear of the building, and Officer Grennan to the side of the house near a bathroom window. When the first officer knocked on the front door, the third, looking through a screened window into the bathroom, saw one of the occupants empty something from an ashtray into the toilet and flush it. At the same time, the officer in the rear, looking through a vent hole underneath a bedroom window, saw a large package (later determined to be marijuana) and reached inside and took possession of it. Stating that the observations made by the two officers were ''indispensable links in the chain of circumstances furnishing probable cause'' for the arrest of the occupant, the court held ''that officer Grennan's bathroom observations constituted an unlawful invasion of privacy to the same extent as occurred in *Brock* v. *United States*, 223 F.2d 681, at page 685,''[7] (p. 898) noting in addition that *Britt* v. *Superior Court, supra,* 58 Cal.2d 469, already discussed by us *supra* was in ''accord.'' The foregoing portion of *Hurst* is the one seized upon by defendant herein as the basis for an analogy to the case at bench. But the court in *Hurst* also said: ''Officer Hanks' activities constituted a search and seizure. The unconsented to entry upon the backyard of the premises was concededly a civil trespass. If officer Hanks had done no more, this fact would not be determinative without further facts tending to show the degree of privacy appellee enjoyed in that place. *Polk* v. *United States,* 291 F.2d 230 (9th Cir. 1961). But there was a further trespass when officer Hanks reached underneath the house itself in order to remove the package. That appellee is protected against such intrusion of his home is not open to question. *Silverman* v. *United States* (1961) 365 U.S. 505 [81 S.Ct. 679, 5 L.Ed.2d 734].'' (325 F.2d at p. 899.)

We make several observations about *Hurst*: In the first place, as we have already explained, the rationale of *Britt* v. *Superior Court, supra,* 58 Cal.2d 469, and therefore of *Bielicki* v. *Superior Court, supra,* 57 Cal.2d 602 which *Britt* followed, when evaluated vis-a-vis the looking through the

---

[7]The court in *Hurst* quoted the following language from *Brock*: '' 'Whatever quibbles there may be as to where the curtilage begins and ends, clear it is that standing on a man's premises and looking in his bedroom window is a violation of his ''right to be let alone'' as guaranteed by the Fourth Amendment.' ''

window cases (which both distinguished) is not in coincidence with the rationale of *Brock* v. *United States* (5th Cir. 1955) 223 F.2d 681 or *California* v. *Hurst, supra,* 325 F.2d 891. Secondly, although Fourth Amendment protection unquestionably covers the dwelling house and has been extended to the curtilage or area surrounding it, there seems to be a split of opinion among the lower federal courts as to whether such protection extends to the *ground area* of the curtilage as distinguished from *structures* located within the curtilage. (See Davis, Federal Searches and Seizures (1964 ed.) pp. 14-15.) Thus *Brock* and *Hurst* extend the protection and equate trespass with illegal search, while *Martin* v. *United States* (5th Cir. 1946) 155 F.2d 503, 505, *Monnette* v. *United States* (5th Cir. 1962) 299 F.2d 847, 850, and *United States* v. *Hayden* (D.C.Md. 1956) 140 F.Supp. 429, 432-435 do not.[8] Finally, we bear in mind that while we are bound by decisions of the United States Supreme Court interpreting the federal Constitution (U.S. Const., art VI, § 2; *Mackenzie* v. *Hare* (1913) 165 Cal. 776, 779 [134 P. 713, Ann.Cas. 1915B 261, L.R.A. 1916D 127], affirmed 239 U.S. 299 [36 S. Ct. 106, 60 L.Ed. 297]; *Moon* v. *Martin* (1921) 185 Cal. 361, 366 [197 P. 77]; *Perkins Mfg. Co.* v. *Jordan* (1927) 200 Cal. 667, 678-679 [254 P. 551]; *Turkington* v. *Municipal Court* (1948) 85 Cal.App.2d 631, 650 [193 P.2d 795]) we are not bound by the decisions of lower federal courts even on federal questions although they are persuasive and entitled to great weight. (*Stock* v. *Plunkett* (1919) 181 Cal. 193, 194-195 [183 P. 657].)

This brings us to *Polk* v. *United States, supra,* 291 F.2d 230, which seems to have been the real progenitor of *Hurst* and which together with *Hurst,* is cited in *People* v. *King, supra,* 234 Cal.App.2d 423, but which neither of the parties before us has seen fit to cite, much less discuss. In *Polk,* San Francisco police officers with good reason to believe that defendant possessed marked money used in a narcotics transaction went to his residence. He lived in the upper of two flats, each having a separate front entry. They approached and shouted " 'Police! Open the door.' " Receiving no response they shined a light through a door and saw a man at the top of the stairs who immediately disappeared. The officers then proceeded to the rear of the house by going along a narrow alley or corridor on the side of the house and

---

[8]*Martin* is relied upon in *People* v. *Andrews, supra,* 153 Cal.App.2d 333, 338 and *Monnette* is cited in *People* v. *King, supra,* 234 Cal.App.2d 423, 428.

between defendant's house and the house next door. At the end was a solid door set in a wall connecting the two houses. They then continued through the door and another passageway covered by the overhang of defendant's building to a back yard from which steps led to defendant's rear door. As they started to climb these steps, they saw defendant, crouching on the roof, throw a package to an adjoining roof. Upon appeal from a judgment of conviction, the question was raised as to whether the officers' observation of appellant which supplied reasonable cause for his arrest was made from a place within the protection of the Fourth Amendment. The court said: ''We are unable to ascertain from the record who used or was permitted to use the passageway, yard and back stairs, the extent of such use, the nature of the yard itself as to its being enclosed or open to public view, and other facts that would suggest whether the appellant's constitutional rights under the Fourth Amendment had been invaded. *Our view of the case makes such facts, which tend to show the degree of privacy the appellant enjoyed in those places, of paramount importance.*'' (Italics added.) (291 F.2d at p. 232.) The case was remanded to the District Court.

On remand, the District Court concluded that the officers' action was not an unreasonable invasion of Polk's privacy because of the following, among other, factors: the door to the yard was ajar and had neither a latch nor a bolt; the yard was visible through numerous cracks and holes in the fence and open to view from the upper stories of numerous surrounding buildings; the occupants of the lower flat enjoyed free use of the yard; neighborhood children used the yard to play in and freely used the passageway to the yard; garbage was collected from the yard. ''The undisputed evidence . . . shows that insofar as defendant was concerned the rear yard and staircase were nothing more than a means of access to the back door of his flat.'' (*United States* v. *Polk, supra,* 201 F.Supp. 555, 558.)

It is manifest that the decisive factor in *Polk* was the degree of privacy which the defendant enjoyed in the area involved. It is significant that defendant herein does *not* take the position that a trespass upon the area surrounding one's residence is automatically an invasion of privacy as was held in *Brock* and *Hurst,* upon which defendant relies, but rather, as defendant states in his brief, that the ''crux of the matter is the nature and degree of the invasion of personal privacy,'' language more reminiscent of *Polk.*

■ We therefore reach this final conclusion: That looking through a window does not become an unreasonable search merely because a police officer may be on defendant's premises when he makes the observation; that the degree of privacy which defendant enjoyed in the place involved is an important factor in determining the reasonableness of the search; and that essentially the determination of its reasonableness must depend upon the facts and circumstances of the particular case. (*Bielicki* v. *Superior Court, supra,* 57 Cal.2d 602, 605.)

■ Applying the foregoing criteria to the facts of the instant case, we observe that Sergeant Hilliard and his brother officers, having information as to possible narcotics violations, went to the Holway Street premises. Although, under the accepted premise heretofore explained, their information was not sufficient to constitute reasonable cause for an arrest or search, it did justify them in making an investigation. (*People* v. *Gonzales, supra,* 214 Cal.App.2d 168, 172.) Indeed it was their duty to investigate: Hilliard had seen a light in the rear of the house and heard voices coming from that direction.

■ We can find nothing unreasonable in their proceeding to the rear door which appears to have been a normal means of access to and egress from that part of the house. The gate was open and the rear door, actually on the side of the house, would probably be more public than a door at the back of the structure. The sidewalk from the gate to the side porch was further evidence that this area provided a normal access to the house. The structure was a duplex and although the record does not spell it out, it is a reasonable inference that other occupants of the building had use of the area around it. As stated previously, there were no bushes or hedges and no roof over the porch. It would appear that there was no substantial, if any, degree of privacy to the area. ■ As the court stated in *State* v. *Smith* (1962) 37 N.J. 481 [181 A.2d 761, 769], which is relied upon in *People* v. *King, supra,* 234 Cal.App.2d 423, 431: "But it is the duty of a policeman to investigate, and we cannot say that in striking a balance between the rights of the individual and the needs of law enforcement, the Fourth Amendment itself draws the blinds the occupant could have drawn but did not."

■ We conclude that, in the light of all the circumstances, Sergeant Hilliard at the time he made the observa-

tions in question was not on premises constitutionally protected, that his looking through the door and window did not constitute an unreasonable search, and that his conduct was not an unlawful invasion of defendant's privacy. ▮ Since he saw defendant committing the offense charged, he could lawfully arrest him without a warrant (Pen. Code § 836, subd. 1). ▮ The evidence obtained was the product of such lawful arrest. Such being the case, there was reasonable cause to hold defendant to answer. (*People v. Nagle* (1944) 25 Cal.2d 216, 222 [153 P.2d 344].)

The order is reversed.

Molinari, J., and Sims, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied January 19, 1966. Peters, J., was of the opinion that the petition should be granted.